UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SHENZHENSHI JINFANQI TRADING CO., LTD.,     Index No. 1:26-cv-01275-LTS

            Petitioner,     **MOTION TO CONFIRM AND VACATE OR MODIFY AWARD**

  -against-

AMAZON.COM SERVICES LLC and         :
AMAZON.COM, INC.,

            Respondents
-------------------------------------------------------------------x

Petitioner JINFANQI TECHNOLOGY CO., LTD., a third-party seller on Amazon.com ("Petitioner" or "Seller"), pursuant to §10 of the Federal Arbitration Act (FAA), submits this Motion or Petition ("Petition" or "Vacatur Petition") to partially confirm Decision on Dispositive Motion regarding BSA Section 2' enforceability and vacate the final award ("Award") in the case of *Jinfanqi Technology Co., Ltd. v. Amazon.com Services LLC and Amazon.com, Inc.*, ("Amazon"), AAA Case No. 01-24-0008-1325 (the "Underlying Arbitration"), issued by sole arbitrator Steve H. Reisberg ("Arbitrator").

## THE PARTIES

1. Petitioner Shenzhenshi Jinfanqi Trading Co., Ltd. ("SJT") is a Chinese limited liability company organized under the laws of the People's Republic of China. SJT was engaged in selling consumer products online, primarily through Amazon's marketplace. SJT was represented in the arbitration by Julie Guo, Esq., JS Law, 200 E. 36th Street, New York, NY.

2. Respondent Amazon.com Services LLC ("Amazon Services") is a US company and a

Delaware limited liability company with its principal place of business in Seattle, Washington. Amazon Services is the entity with which SJT contracted under the Business Solutions Agreement ("BSA").

3. Amazon.com, Inc. ("Amazon Inc.") is the second named Respondent and was included as a party in the arbitration. In the Final Award, Amazon Services and Amazon Inc. are collectively referred to as "Amazon." Amazon was represented by Macaulay Ivory, Esq., Davis Wright Tremaine LLP, 920 Fifth Avenue, Suite 3300, Seattle, Washington.

## JURISDICTION AND VENUE

4. Petitioner Shenzhenshi Jinfanqi Trading Co., Ltd. ("SJT") is a foreign corporation organized and existing under the laws of the People's Republic of China, having its principal place of business in Shenzhen, Guangdong, China. Respondent Amazon.com Services LLC is a Delaware limited liability company with its principal place of business in Seattle, Washington, and Respondent Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), as the dispute is between a citizen of a foreign state and citizens of a State of the United States, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. See *Exclusive Trim, Inc. v. Kastamonu Romania, S.A.*, 698 F. Supp. 3d 621, 624 (E.D.N.Y. 2023).

6. Subject matter jurisdiction is also proper under 28 U.S.C. § 1331 and 9 U.S.C. § 203, as this action arises under the laws of the United States and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 (the "New York Convention"). Petitioner

seeks vacatur of a final arbitration award arising out of a commercial relationship involving a foreign party, which the Final Award expressly states was "made in New York, New York, United States of America" for purposes of Article I of the New York Convention. (Exhibit P6 at 23).

7. This Court has personal jurisdiction over Respondents because the arbitration was seated in New York, New York, Respondents participated in the arbitration proceedings conducted in New York, and the Final Award was rendered in this district. Respondents further consented to this Court's jurisdiction through the arbitration agreement contained in the Amazon Services Business Solutions Agreement, which provides that disputes are governed by the Federal Arbitration Act and administered by the American Arbitration Association. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*, 553 F.2d 842, 845 (2d Cir. 1977).

8. Venue is proper in this District pursuant to 9 U.S.C. § 10, which authorizes a motion to vacate to be brought in "the United States court in and for the district wherein the award was made," and pursuant to 28 U.S.C. § 1391, because the Final Award was made in this District and a substantial part of the events giving rise to this action occurred here. *Concourse Beauty School, Inc. v. Polakov*, 685 F. Supp. 1311, 1314.

9. Accordingly, this Court has subject matter jurisdiction over this action, personal jurisdiction over the parties, and venue in the Southern District of New York is proper.

## STATEMENT OF FACTS, BACKGROUND, AND PROCEDURAL HISTORY

### I. The Parties and the Adhesion Contract

10. Petitioner, Shenzhenshi Jinfanqi Trading Co., Ltd. ("Petitioner" or "SJT"), is a small foreign retail company that sought to reach U.S. consumers via the e-commerce marketplace

controlled by Respondents Amazon.com Services LLC and Amazon.com, Inc. (collectively, "Amazon"). To access this market, Petitioner was required to adhere to Amazon's standard form Business Solutions Agreement ("BSA").

11. The BSA is a classic contract of adhesion. Small retailers like Petitioner have no viable choice but to accept its terms—including Amazon's control over their inventory, shipping, and finances—if they wish to access the dominant U.S. online marketplace. Central to this dispute are Sections 2 and 3 of the BSA, which Amazon uses to appoint itself "prosecutor, judge, jury, and executioner." (Exhibit P1). Section 3 allows Amazon to deactivate accounts at will, while Section 2 purports to authorize Amazon to permanently withhold 100% of a seller's sales proceeds if Amazon, in its "sole discretion," determines a breach has occurred (Exhibit P1).

12. All third-party sellers on the Amazon marketplace must accept the terms and conditions of the Amazon Services Business Solutions Agreement (the "BSA"). (Exhibit P6 at 2). The terms of the BSA are amended from time to time, and in this proceeding, the Parties disputed which version governed the arbitration. In Procedural Order No. 3, the Tribunal ruled that the version of the BSA in effect as of November 22, 2022 governs this arbitration. (Exhibit P6 at 2).

13. The BSA contains a mandatory arbitration clause (Section 18) providing that "any dispute with Amazon... or claim relating in any way to this Agreement... will be resolved by binding arbitration." (Exhibit P6 at 3). The agreement further mandates that the arbitration be conducted by the American Arbitration Association (AAA) under its Commercial Rules, and specifies that the laws of the State of Washington, together with the Federal Arbitration Act (FAA), govern the arbitration. (Exhibit P6 at 3).

**II. The Seizure of Funds and Procedural History**

14. Petitioner is a small foreign retail company that wanted to sell its products on the e-commerce marketplace controlled by Amazon.com Services LLC, and its related companies ("Amazon" or "Respondent"). In order to conduct business through Amazon, it was required to adhere to Amazon's standard form-the BSA. Having no experience in the U.S. market, Petitioner did not know that the BSA was an adhesion contract and several of its terms were unconscionable. The Petitioner also agreed to use Amazon's inventory storage and order fulfillment service called the Fulfillment by Amazon ("FBA") program to receive priority in customer search on product and to be placed on the front page of customer search results on Amazon.com. Once Petitioner became an authorized Seller, all its communications with Amazon, including all business interactions, all emails, all sales transaction records, and all financial records, were made through Amazon's proprietary computer portal called Seller Central. Communicating by voice with an authorized person was essentially impossible.

15. On September 6, 2023, Amazon abruptly deactivated Petitioner's seller account and seized the entire sales proceeds therein, totaling $163,323.33 (the "Frozen Proceeds"). Amazon still refuses to release the frozen proceeds to the Petitioner as of today. (Exhibit P9)

16. The claims asserted by Petitioner against Amazon are typical of how small third-party sellers ("Sellers") have been routinely exploited and abused by Amazon for many years. This pattern of appalling business practices and behavior finally attracted government action. On September 26, 2023, the U.S. government and 17 states sued Amazon in a landmark monopoly case reflecting years of allegations that Amazon abused its economic dominance and harmed fair competition. The 172-page complaint alleges Amazon unfairly promotes its own platform and services at the expense of Sellers who rely on the company's e-commerce marketplace for

distribution (Exhibit P10).[1] In its press release, the Federal Trade Commission ("FTC") Chair Lina Khan accused Amazon of using "punitive and coercive tactics" to preserve its illegal monopoly. "Amazon is now exploiting its monopoly power to enrich itself while raising prices and degrading service for the tens of millions of American families who shop on its platform and the hundreds of thousands of businesses that rely on Amazon to reach them," Khan said, "Today's lawsuit seeks to hold Amazon to account for these monopolistic practices and restore the lost promise of free and fair competition." (Exhibit P11).

17. Amazon's singular dominance and market power have been recognized by Congress. According to the *Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary,* of which the Petitioner requests the Arbitrator to take judicial notice, Amazon is the dominant online marketplace. It reportedly controls about 65% to 70% of all U.S. online marketplace sales.[2] Amazon is the most-visited website in the world for e-commerce and shopping.[3] Amazon has monopoly power over most Sellers and many of its suppliers.[4] Retailers have no alternative but to submit to Amazon's business terms because that is where the buyers are.[5] (Exhibit P12). Small retailers have no viable or meaningful choice other than accepting Amazon's BSA terms and its control of their inventory, shipping, and finances if they want to get their products seen

---

[1] Brian Fung, "*US government and 17 states sue Amazon in landmark monopoly case*" (September 28, 2023), available at https://www.cnn.com/2023/09/26/tech/ftc-sues-amazon-antitrust-monopoly-case/index.html

[2] See Page 225 of Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary ("House Report").

[3] *Id.* page 256

[4] *Id,* page 256

[5] *Id,* page 256

by most online consumers.[6]

18. Sales on Amazon fall into one of two categories: (1) first-party sales, which refer to the sales of Amazon's own private-label products or wholesale products sourced by Amazon, and (2) third-party sales, which refer to sales by independent merchants who sell their own products through the Amazon Platform. Since Amazon reaps thirty-five percent (35%) of the sales proceeds of the average Seller, one might wonder why Amazon continually fails to treat Sellers fairly. The reason is that it exploits the Sellers while constantly gaining more customers for its own sales. Therefore, there is significant competition between first-party sales (Amazon's direct sales) and third-party sales, including Petitioner. In its internal documents, Amazon refers to Sellers as "*internal competitors.*"[7]

19. For years, Amazon's critics, including US lawmakers, European regulators, Sellers, consumer advocacy groups, and more, have accused the company of using its market power to force its Sellers to accept anticompetitive terms (Exhibit P13). Sellers also have accused Amazon of arbitrarily blocking their Seller accounts and withholding sales proceeds, spying on them, copying their best-selling products, and giving Amazon's own products—first-party sales—preferential search results. All of these activities reflect Amazon's absolute power over the Sellers.

20. Amazon relies on automated mechanisms and error-prone fraud detection software to identify and punish third-party sellers Amazon suspects of violating Amazon Services Business

---

[6] Marcia Savage, *Amazon's e-commerce dominance: Is the price too high?* The Future of Commerce (January 28, 2022), available at https://www.the-future-of-commerce.com/2022/01/28/amazons-e-commerce-dominance-is-the-price-too-high.

[7] See Page 268 of House Report, *Id*

Solution Agreement and incorporated policies.[8] Algorithmic errors can and do lead to abrupt account deactivation and removal of product listings, which can be financially devastating for third-party sellers.[9] Without presenting any evidence to sellers to support its allegations of term violations, Amazon blocked over 55,000 seller accounts in 2021, seizing all the sales proceeds.[10] (Exhibit P14). The Petitioner is one of them.

21. As previously noted, before an independent merchant can open a third-party seller account ("Account") on the Amazon Platform, they must adhere to the BSA. These small domestic and foreign merchants have no negotiation power as to the fairness of the BSA's terms.

22. Amazon's BSA, an adhesion contract, contains the below:

- Section 2, entitling Amazon to **seize <u>any</u> sales proceeds** in the account, whenever Amazon solely determines that the seller has violated the BSA terms.

- Section 3, entitling Amazon to deactivate *any* seller account at *any* time *at will*;

- Section 8, exonerating Amazon from any liability related to the BSA; and

- Section 18, Mandatory Arbitration **and class action waiver Clause** ("Arbitration Agreement") forcing sellers to go through expensive arbitration proceedings for any dispute on an individual case basis,

---

[8] Katherine Anne Long, "Amazon abruptly banned Washington state treat-maker Chukar Cherries. Months of appeals went unheeded," *The Seattle Times* (Sept. 27, 2021), available at https://www.seattletimes.com/business/amazon/amazon-abruptly-banned-washington-state-treat-maker-chukar-cherries-months-of-appeals-went-unheeded.(Ex. P-M4)

[9] *Id.; See also* House Report at 270, n. 1670 ("Among the most egregious examples of Amazon's arbitrary treatment of sellers are its abrupt suspensions of their Account, frequently made without explanation. Once Amazon suspends a third-party seller's Account or delists its products, its business is left with largely ineffective remedies as it watches its sales disappear."); *Id.* at 271 ("Because of the severe financial repercussions associated with suspension or delisting, many Amazons' third-party sellers live in fear of the company.").

[10] Long, *supra, footnote 9*.

23. Once a Seller establishes an account and gains sales, its entire business remains in jeopardy due to Amazon's absolute control of its fate. Through abrupt account deactivations under Section 3 of the BSA (Exhibit P9), Amazon removes the selling privileges of Sellers *at will*, thus reducing the competition between third-party sellers and Amazon's own sales.

24. Upon account deactivation, Amazon also confiscates the entire sales proceeds in the Seller's account, ranging from thousands to millions of dollars, representing two weeks to two months of a seller's sales of merchandise on Amazon. Many small companies do not have the resources to contest their termination. Through this scheme of confiscating the proceeds found in Sellers' accounts, Amazon adds to its profits.

25. Amazon justifies this unwarranted money grab by relying on Section 2 of the BSA. Section 2 provides in part: "*If we determine that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may in our sole discretion permanently withhold any payments to you.*" By this contract term and other BSA terms including Section 3 and 8, Amazon appoints itself prosecutor, judge, jury, and executioner of the fate of small Sellers like Petitioner.

26. After Amazon deactivated the Petitioner's seller accounts, and seized the entire sales proceeds in the Petitioner's seller account in 2023, per the mandatory arbitration clause in Section 18 of the BSA, Petitioner filed a Demand for Arbitration with the AAA in 2024, seeking the release of the Frozen Proceeds and a declaration that the forfeiture provisions of the BSA were unconscionable and unenforceable (Exhibit P2).

27. Respondents Amazon.com Services LLC and Amazon.com, Inc. (collectively, "Amazon") filed their Answer and Counterclaims on November 5, 2024. (Exhibit P3).

28. The Petitioner in this case is a Chinese corporation, and the respondent Amazon is a US corporation. Per AAA rule 16[11] and ICDR rule 13[12] below, a foreign arbitrator who is non Chinese and American should serve as the sole arbitrator.

29. Considering the significant deteriorating relationship between the US and China, the Claimant requested a list of foreign arbitrators per ICDR rules to have a fair hearing in this international arbitration. Even though Amazon disagreed with a list of foreign arbitrators, per the ICDR rules, upon ONE party's request, a list of foreign Arbitrators can be provided; It is not upon both parties' consent. It means that no matter whether Amazon consents or not, as long as one party requests, then a list of foreign Arbitrators can be provided.

30. The Petitioner presented this request, relevant rules, and arguments to the AAA multiple times, but by the end, an American Arbitrator, Steve H. Reisberg was appointed as the sole arbitrator for this arbitration case.

31. After the appointment of the Arbitrator, A preliminary hearing was held on April 24, 2025. The Arbitrator also allowed the Petitioner filed a dispositive motion regarding BSA Section 2's enforceability.

---

[11] AAA R-16. Nationality of Arbitrator
Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these Rules.

[12] ICDR Article 13: Appointment of Arbitrators
….At the request of any party or on its own initiative, the Administrator may appoint or submit a list(s) including nationals of a country other than that of any of the parties.

32. On July 6, 2025, the Tribunal issued Procedural Order No. 3, ruling that "The contractual interpretation of Section 2 of 2023 BSA is clear as a matter of law and the application of the law of liquidated damages to Section 2 makes it equally clear the Section 2 is not a valid liquidated damages clause." (Exhibit P5)

33. Following several procedural orders (POs No. 4, 5, and 6) regarding hearing structure and agendas, the evidentiary hearing was conducted via video conference on October 3, 2025. (Exhibit P6 at 5). The parties submitted their respective Post-Hearing Briefs on October 20, 2025,

34. The Arbitrator issued the Final Award on November 19, 2025. In the Final Award, the Arbitrator reaffirmed that Section 2 of the BSA is an unenforceable liquidated damages clause. (Exhibit P6 at 15). Therefore, Amazon's initial seizure of the funds was technically a "breach of the BSA," (Exhibit P6 at 16) and Amazon should be ordered to release Petitioner's frozen proceed in the seller account.

35. However, contrary to his finding of Section 2's unenforceability, the Arbitrator ruled that SJT was not entitled to the return of the funds and allowed Amazon to retain the frozen proceeds.

36. Even though Amazon did not seek the compensation of damage of $143,206.41 and did not provide any evidence to substantiate the alleged damages and causation, the Arbitrator still found Amazon's actual damages totaled $186,536.48 ($128,530.24 from the liquidation fraud plus $58,006.24 in unpaid FBA fees). Since this amount exceeded the frozen proceed of $143,206.41, Amazon was permitted to keep 100% of the funds as "partial compensation." (Exhibit P6 at 17).

37. On December 4, 2025, Petitioner timely filed a Motion to Modify the Final Award pursuant to Article 36 of the ICDR Rules (Exhibit P7). Petitioner argued that the Award contained manifest computational errors and failed to effectuate the necessary legal consequences of the Arbitrator's own prior rulings. Specifically, Petitioner asserted that once the Arbitrator declared Section 2 of the BSA to be an unenforceable penalty, the immediate "computational consequence" should have been the restoration of the status quo ante through the return of the $143,206.41 in seized funds (Exhibit P7 at 1, 5).

38. Petitioner further challenged the Award's "actual damages" calculation as an "evident material miscalculation of figures" under 9 U.S.C. § 11. Petitioner pointed out that Amazon failed to produce a single invoice, payment record, or audited ledger to substantiate its alleged losses, and that the Arbitrator's reliance on speculative testimonial assertions to find a set-off of $186,536.48 was an error of law and fact. Petitioner maintained that because the burden of proof shifted to Amazon upon the invalidation of Section 2, the proper input for any set-off calculation, in the absence of credible evidence, should have been "NIL" (Exhibit P7 at 2, 9).

39. On December 31, 2025, the Arbitrator issued a summary order denying Petitioner's Motion to Modify and reaffirming the Final Award in its entirety (Exhibit P8). This summary denial exhausted all available administrative remedies within the arbitral forum, necessitating the filing of the instant Petition for vacatur before this Court.

40. The Arbitrator's departure from the established legal standard for BSA Section 2 disputes is further evidenced by several recent AAA/ICDR awards involving nearly identical facts and the same Respondents. In cases such as *Xuruhuan v. Amazon* (Exhibit P15), *Shenzhen Shisen Tech v. Amazon* (Exhibit P16), and *Ultimate Global v. Amazon* (Exhibit P17), arbitrators

correctly held that Amazon could not retain seller funds once Section 2 was deemed an unenforceable penalty. The Award in this case, by contrast, creates an irrational and unprecedented exception that allows Amazon to achieve the same punitive result without any evidentiary basis.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully moves this Court, pursuant to the Federal Arbitration Act ("FAA") 9 U.S.C. § 10(a)(4), for an Order and Judgment:

A. Confirming the Arbitrator's Declaratory Ruling: Confirming the Arbitrator's legal determination in Procedural Order No. 3 and Final Award that Section 2 of Amazon's Business Solutions Agreement ("BSA") is an unenforceable liquidated damages clause and does not, as a matter of law, entitle Respondents to the permanent withholding of Petitioner's sales proceeds; which is reaffirmed in the Final Award;

B. Vacating or modify the Final Award in Part: Vacating or modifying that portion of the Final Award which authorized Respondents Amazon.com Services LLC and Amazon.com, Inc. (collectively, "Amazon") to retain $143,206.41 in seized funds as "partial compensation" for "actual damages," on the grounds that the Arbitrator exceeded his powers under 9 U.S.C. § 10(a)(4) and manifestly disregarded the law, by granting an unpled, judicial-style setoff remedy that contradicts the Tribunal's own finding of a contractual breach;

C. Remanding for Limited Reconsideration of Remedy: In the alternative, remanding the matter to a new arbitrator with specific instructions to reconcile the remedy with the Tribunal's legal findings, requiring that:

    a. Amazon must remit the funds improperly seized under the voided Section 2 liquidated

damages clause; and

b. Amazon may only seek recovery of actual damages through a properly pleaded counterclaim, subject to an evidentiary accounting and Petitioner's right to rebuttal as required by Washington law;

D. Awarding Costs and Fees: Awarding Petitioner the costs and disbursements of this proceeding, together with reasonable attorney's fees to the extent provided by law or the parties' agreement; and

E. Other Relief: Granting such other and further relief as this Court may deem just and proper.

Dated: February 25, 2026

Respectfully submitted,

       /s/ Julie Guo
JULIE GUO
JS Law Office
200 East 36th Street, 16th Floor
New York, New York 10016
jslawusa@gmail.com
(917) 773-1868